This is Andrea Barton versus the Attorney General. Mr. Fogel should be here for the petitioner. Mr. Hayes for the Attorney General. And Mr. Fogel, you may begin when you're ready. Good morning, Your Honor. May it please the Court, my name is H. Glenn Fogel, Jr. I'm the attorney for the petitioner, Mr. Andre Barton. The important thing the Court needs to recognize here is the rule against surplusage. The statute should not be interpreted in a way that renders the word superfluous. Thus, any construction of the statute that does not give meaning to every word implicates the rule against surplusage. The issue in this particular case is that Respondents in removal proceedings are treated differently. People that are outside the United States coming into the United States are inadmissible. The way you read the statute is the stop time statute. You read it to say that you have to apply for cancellation of removal and be denied cancellation of removal in order to be rendered inadmissible under the statute, as that terminology is used in the statute. Is that right? Right, Your Honor. What we're saying is Mr. Barton was charged as being removable. He is actually not removable under the stop time, I mean, under the statute. But he did commit a crime of moral turpitude before the seven years of his admissibility ran up, right? Yes, but he was not removable for that. And that's the issue here. Your argument is that he has to be rendered inadmissible rather than just having committed a crime of moral turpitude. Right. In order for him to be rendered inadmissible, he has to be applying for admission to the United States. He had to have left the United States and be returning back. But my question is, why would it matter for the purpose of the statute whether he actually applied for admissibility or not if he undisputedly is ineligible for admissibility? Why does it matter? Because he's not deportable. He's not actually deportable or removable, which again are the same, I mean, have changed over the years. But he is not removable for this particular offense. He's not charged as being removable for this offense because it was committed after five years. There's a difference. But the language of the statute says when he's committed a CMT, I mean, you accept CMT as a qualifying offense, renders the alien inadmissible to the United States. Isn't that a status instead of an action? Well, that's the thing is it's not, renders is an action verb. And in this particular case, he had not left the United States and was not applying for admission. So the commission of that offense did not render him inadmissible because he was still in the United States. His status is that he is inadmissible, his status. No, that's not his status, Your Honor. I thought you just said he was. No, his, if he had left the United States and was returning, then he would have been inadmissible. But, I mean, to Judge Vinson's point, isn't it, no, I mean, his, I actually think that renders is a different verb than is. I mean, he is rendered theoretically, if you will, inadmissible. And if he ever leaves the country for 180 days and tries to come back, then he is not getting back in because of the status that Judge Vinson has described. So, I mean, he is inadmissible in the ether. And if he ever leaves and tries to come back, then that ether-like status will ripen, materialize, and it will prevent him from coming back in. Right, but it's our position, Your Honor, that it's not a speculative, this is not a speculative situation. It's a real situation because if he had never, he's not removable for this particular offense because it's a crime of moral turpitude outside the five years, which is different from just being any crime of moral turpitude whatsoever. So let me ask you this, and you can tell me, this analogy may not be right at all, but if someone has a terminal illness, doesn't the illness render that person untreatable, even if that person is not currently seeking treatment? Tell me why that analogy doesn't work. The reason that analogy doesn't work, Your Honor, is because the Immigration and Nationality Act treats aliens differently, treats people that are outside the United States applying for admission differently than people that are already in the United States. But doesn't the statute, 1101A13C, recognize that a lawful permanent resident can relinquish his or her status if he or she leaves the country, say, for 180 days, tries to come back? At that point, admissibility is very important, right? And this gets back to your defense's question, it's a status inquiry. Well, if they leave the United States, and actually it's only if they leave for more than a year, do they lose their permanent residence. But if they leave for more than 180 days, it's a presumption that they've abandoned it. That's correct, but that's not really, I mean, that's not the issue here. The issue is here, if they would have meant for this to apply to everybody, anytime they committed a CIMT and would be able to leave at some point later in the future and come back, they would have just said that. They wouldn't say inadmissible or removable. This is a new issue in this circuit, but other circuits have certainly considered this. Has any circuit agreed with your position, Mr. Fogle? No. I think the only circuit that I believe that ruled on a similar issue, which I'm going to differentiate, was the Second Circuit. I can't remember the name of the case. It was the Second Circuit case that, in that case, it was a drug offense and the person had actually left the United States and was returning back. There was Heredia, but the Third Circuit agreed with the Second Circuit and even the Fifth Circuit, although it reached it a little bit differently, all of them have disagreed with your position, though, that this somehow allows him to have to apply. Well, and I'll tell you the difference with any of these cases. I couldn't find any case that, again, you have to look at 212, INA 212 and INA 237 treat people differently. So, for instance, a firearms offense is a deportable offense, but it's not a ground of inadmissibility. A CIMT that's a petty offense, it's a misdemeanor where the sentence was less than six months, is not a ground of inadmissibility, but it can be a ground of deportability. An offense for domestic violence under 237 is a deportable offense, but it's not a ground of inadmissibility. All of those cases track the same crime. So, where it's a crime of removability, it's also a crime of inadmissibility. So, the drug offense, the Heredia case, the drug offense, plus the guy also left. All of those cases, and even with the BIA, all of those cases are, they track, they treat the person exactly the same. Where a person is, the only way that this statute makes sense is for, is when the, both crimes are inadmissible and removable at the same time. In this case, it's only removable. It's not a crime of inadmissibility. And so, therefore, there's a surplusage here. And because there's a surplusage, we have to look at interpreting what the word renders actually means. It renders inadmissible when they're applying for inadmissibility, and there's deportable for being inadmissible. So, I don't know, I don't know even, I don't have a note in my notes, so to speak, but I've got written down in my notes that render means, quote, to cause or to become. So, back to Judge Vinson's question, why isn't that a status-based definition? It's different from is. Well, one can only become inadmissible if they leave the United States. See, that's interesting. I actually think that one becomes inadmissible as soon as one commits the crime of moral turpitude, and then the application of that status materializes later. But you sort of carry around this scarlet letter, so to speak. Then why would they be, then they wouldn't be, but if it's after the five years, they're not removable. And if proceedings are never brought, they're still here. So, what happens if the person leaves voluntarily, as you said, for a year, and then coming back into the country, what happens? Well, if they leave voluntarily for a year, statutorily they have abandoned their permanent residence. Right, at which point they need a new admissibility determination, right? Correct. But they're inadmissible because of this crime of moral turpitude. Well, they would have to apply for admission again through whatever way they could because they would lose their permanent residence, but that's correct. And one more example, the possession of marijuana less than 30 grams is not a deportable offense, but it's a ground of inadmissibility. So, you have to leave the United States and be applying for admission for that to become an admissible. The only way this, again, just to reiterate, the only way it even makes sense with the rule of surpluses and where there's two different treatments of somebody applying for admission and somebody in the United States is if the stop time rule works when somebody leaves and they're applying for admission. That's the only way it makes sense here. All right, you've reserved some time, Mr. Fogle. We'll hear from the government. Mr. Hayes. Thank you, Your Honors. It may please the Court, Timothy Hayes on behalf of the Attorney General. Under the stop time rule, a person's period of continuous residence shall be deemed to end when two requirements are met. The first requirement is the applicant must commit an offense referred to in Section 1182A2. That issue is not disputed. The second requirement is that offense must render the alien inadmissible or removable from the United States. Mr. Barton's offense renders him inadmissible under the crime of all moral turpitude provision. The statute's plain language uses the word renders, which, as Judge Newsom was getting to, Heredia and the Merriam-Webster Dictionary defines it as to cause to be or become. It's a status. The minute he committed that crime of all moral turpitude, he was rendered inadmissible to the United States. Well, I should correct it. The minute he committed that crime of moral turpitude, he was potentially inadmissible from the United States. What actually triggered his inadmissibility was the fact of conviction. And that's how you differentiate the two prongs of the statute. Is there discretion on the part of the government? Can the government decide not to seek removal proceedings? The government at any time can choose not to seek removal proceedings, Your Honor. That would support his argument, though. If you commit a crime of moral turpitude before the seven years is up, and the government decides not to seek removal proceedings against you, I'm sure not everybody who commits crimes of moral turpitude is removed. So if there's discretion on the part of the government, why doesn't that support his interpretation of the statute? He hasn't been rendered inadmissible, has he? It does render him inadmissible in this sense, Your Honor. The government has discretion as to whether to bring removal proceedings at all, and that's what I was getting to. It does not have discretion as far as statutory eligibility requirements for cancellation or removal. And the first prong is commit an offense. So once he committed, prong one is met. Prong two requires him to be rendered inadmissible. To be rendered inadmissible, you either have to have a conviction or you have to admit to the essential elements of the crime. And until Mr. Barton did that, either in removal proceedings or he was convicted, then that second prong is triggered. In this case, it was triggered right away because he was actually convicted of the crime. All right. Well, let me ask the next question then. What if, in fact, he commits a crime of moral turpitude, he's convicted of committing a crime of moral turpitude, the government brings removal proceedings against him because he's been rendered inadmissible, is there a discretion on the part of the government? No, Your Honor. Well, why does the statute use the word renders the alien inadmissible? You could take that language out of the statute then. It's a surplusage. Well, renders describes a status that he has. I don't read that language as being surplusage. The surplusage more comes from whether he was inadmissible or removable. But I don't read the renders language as surplusage. Could you take those words out of the statute? Okay. So we would say— If you take those words, all you have to do is commit a crime of moral turpitude. No, Your Honor. Why couldn't you take those words out of the statute? Because, again, it has to render the alien inadmissible. And under 1182— But I thought the government's argument is that all you have to do is commit a crime of moral turpitude. No. You have to either be convicted or admit to the essential elements of that crime in order for that second prong to be triggered. All right. So then my question is, if you commit a crime of moral turpitude and you're convicted, period, you can't stay, right? As long as the other elements is within the 7 U.S. history, Your Honor. All those elements. Right. So if that's the case, then why do you need this language that renders the alien inadmissible? Because if that language wasn't there, then any person who committed an offense but wasn't convicted of it, arguably could be statutorily ineligible for cancellation or removal. An LPR may be considered inadmissible— You've committed a crime of moral turpitude, you've been convicted, and so there's no discretion on the part of the government to overlook that and cancel removal? There might be a way— Because the way I understand the statute is, this is for the purpose of determining whether or not you are statutorily eligible for cancellation of removal, right? Yes, Your Honor. I mean, there is a distinction between whether one is subject to removal from the United States and whether they're eligible for relief from removal, and they're distinct. In order for Mr. Barton, for example, to be charged and subject to removal, he has to be deportable. But in the relief stage, there are lots of instances where an LPR is also inadmissible in that manner, so the relief stage. But to get more to your question, there is a possibility where an individual could apply for what's called an 1182H waiver. It doesn't apply in this case because he doesn't meet the eligibility requirements for it, but it's possible that there could be some waiver that might apply to Prong 1 in the Garcia case, and the Board does that. But generally speaking, no. If someone has committed the crime and they've been convicted of it, and it's been within the seven years, there is no discretion. A lawful permanent resident may be considered inadmissible to the United States without seeking admission, and I think we've touched on some of that. One is at the border, for example, when the alien is applying for admission, and it goes beyond just being absent from the United States more than 180 days. Once you commit a crime involving moral turpitude and you leave the United States, a lawful permanent resident is again subject to admissibility requirements at the border. So you leave for an afternoon tour in Tijuana or something. That's correct, Your Honor, because the flu doctrine was abrogated in 1996. The flu doctrine would have excused that, but since 1996, the case is he would be an applicant for admission at that point. Another example is lawful permanent resident's proceedings for an aggravated felony conviction. Most of the time an aggravated felony conviction precludes the alien from getting any room for removal at all. However, there are certain instances where applicants can seek an adjustment of status through a relative, and there's no ag felon admissibility ground. There's only the crime involving moral turpitude ground. They can, in certain instances, get what's called an 1182-H waiver. So again, an admissibility applies even though while they're in proceedings they're still considered lawful permanent residents. The third example is lawful permanent residents can apply for what's called cancellation or removal for non-permanent residents, which is under Section 1229A. Again, the alien is a lawful permanent resident, but he can apply for things that are more geared towards people that are just inadmissible to the United States. Can I ask you a question since you paused? Yes, sir. How hard are you going to ride this Chevron deference argument? I mean, is that really sort of part of your presentation? No, Your Honor, because even the board in Bordeaux said it was plain language. The Chevron argument is only to the extent that the board did use a dictionary definition to determine the word renders, and they said it was to cause to be or become in Bordeaux. So to the extent the court finds that provision ambiguous, which I don't think it is, but to the extent the court does, it should take into account and defer to the board that the board is interpreting it that way. So if that's in a reasonable way, that's how that word should be read. So there's no dispute here, though, that this is a non-presidential single-judge decision. I was trying to figure out exactly how it is that that happens and how I verify it is that that's what happens. I take it there's no dispute here that that is what this is. This is a one-member, yes, it's an unpublished one-member board decision. But Chevron also applies if the board is relying on a presidential decision. And they did cite to or they used Bordeaux in their definition of the term renders, which is what we were getting at. But does that require, like, rely on? You know, we as a court in unpublished dispositions sometimes will say we are lock, solid, cinch-bound by prior panel precedent in Smith v. Jones. There's no way around this thing. It's the same issue, same procedural posture, same everything. Why would we publish an opinion? Isn't that what this is talking about? Not, like, sort of in the same space but requires a little bit of extra reasoning. Honestly, I think it depends on the judge, to be honest, Your Honor. Everyone kind of reads that a little differently. I think, and this court did say in Arvallo, they said where the board has interpreted an ambiguous provision in a published presidential decision, it defers to under Chevron. I would argue that Wardo did interpret this provision and interpreted the word renders, so that would be enough. But I understand the counterargument that without them explicitly saying so and relying on unpublished decision, it might not satisfy the court. But I think it could. I think reasonable minds could disagree on it. Let me just make sure that you acknowledge that Mr. Barton is not removable, but he is inadmissible. He is removable, but not for the CIMT, yes, Your Honor. That's correct. Because of the time. Yes. But as he sits, he's not removable, but he is inadmissible. Well, yeah, he is, and he's in removable proceedings for a firearm misdefense, which is not in an admissibility ground. Ironically, it's only a deportability ground. So once that is determined by an immigration judge, it sort of shifts into what's called the release stage of proceedings. And at that point, then certain relief provisions require you to determine whether he's deportable or inadmissible, and this is one of those. Didn't the Fifth Circuit find the statute to be ambiguous in Calix v. Lynch? Yes, Your Honor, yes, they did. But they didn't defer, right? They didn't defer Chevron. No. They just sort of did it for themselves. They didn't defer to Chevron because they read Wardo very strictly, and Wardo didn't present the exact question. And so, like I said, I agree that reasonable minds can differ on the point. Then that support his argument that the statute is ambiguous. If you've got at least another circuit that says the statute is ambiguous, so therefore we go to the next step, which is to determine whether or not the agency's interpretation should be given Chevron deference rather than, I understand your argument, is that the plain language of the statute is clear. Right, Your Honor. We have at least one other circuit, the Fifth Circuit, that has come to the conclusion that, no, the language of the statute is ambiguous, and therefore we go to the Chevron analysis. That's right, Your Honor. But two circuits, the third and the second in Heredia, have said it's plain language. And the Board, as I read Wardo, read the provision the way we do, and so we would argue plain language is sufficient. But if not we're not bound by those circuits. That's true. That's absolutely true, Your Honor. Is there any other circuit, I ask Mr. Fogle, any other circuit resolve this besides the second and the third and the fifth? No, Your Honor, not that I'm aware of. It is pending in the ninth right now, but it hasn't been published. Unless Your Honors have any further questions. Thank you very much. All right. Mr. Fogle, you have reserved some time for rebuttal. Mr. Fogle. He only needed a few more months before he committed his crime of moral interpretation. But he wasn't deportable for that. And, again, the statute is ambiguous. It doesn't make sense. It only makes sense if you're removable and inadmissible for the same offense, because otherwise you're treating permanent residence differently. So then to Judge Wilson's question, and the backside of mine, I guess, why not defer? If you say the statute doesn't make sense, sort of we can't make heads or tails of it, then why not defer to what the agency has told us? Because they're wrong. I mean, you have to look at, and we can disagree with what renders means and what it doesn't mean. But if you look at the Immigration and Nationality Act, it treats, it has two different sections, one for inadmissibility and one for removability. You know, Mr. Barton was not removable for this offense, therefore it should not operate to stop the time. It just seems like there's a lot of headwind here because you're asking us to conclude, without respect to the nature of the deference that we may give the BIA's decision here, whether it's Chevron or something less, something like Skidmore, you're asking us to discount the agency's interpretation and the Second Circuit and the Third Circuit and the Fifth Circuit, all of which, for one reason or another, have construed the statute differently than you do. And I've pointed out previously, I think, the difference with those cases, that the person was removable and inadmissible for the same offense. And that's not the case here. And it doesn't make sense that the people are, that the stop time rule doesn't work against the, against firearms offenses, doesn't work against family violence offenses, it doesn't work against, you know, single, certain crimes of moral turpitude. Then why is it the other way around? Statutes don't have to be logical, though, Mr. Fogle. There are a lot of statutes that aren't logical, but that's what they say. That's true, but that's why the courts have to interpret it in a way that makes sense, in a way that is logical. That's why there's the rule against surplusage. No, we have to apply the law as it's enacted. Well, you have to interpret the statute. That's why there are rules of statutory construction, one of which is the rule against surplusage. And this is a perfect example where the Immigration Nationality Act violates the rule against surplusage here. It only makes sense if a person is left and removed. And I think you, if Your Honor doesn't have any other questions, I think I've made my point. I have your argument, counsel. Thank you. Thank you, Your Honor.